IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| FRANK JONES, #118930, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 2:09-CV-367-WC |
| ) | [WO] |
| ) | |
| DR. CORBITT, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Frank Jones ["Jones"], a state inmate, in which he challenges the medical treatment provided to him for chronic constipation and related bowel discomfort during his confinement at the Elmore Correctional Facility ["Elmore"]. Specifically, Jones alleges the defendants failed to provide "the treatment necessary to eliminate" his constipation. Pl.'s Compl. (Doc. No. 1) at 3. Jones names Dr. Corbitt, Dr. McAuther and Correctional Medical Services as defendants in this cause of action.[1] Jones seeks monetary damages and requests issuance of an order requiring the defendants to provide him proper medical treatment for his chronic constipation. *Id*. at 4.

---

[1] The defendants indicate Dr. Corbitt's true name is Dr. Paul Corbier and further advise Dr. McAuther is actually Donald McArthur, a physician's assistant.

The defendants filed a special report and relevant supporting evidentiary materials addressing Jones' claim for relief. Pursuant to the orders entered in this case, the court deems it appropriate to construe this report as a motion for summary judgment. June 15, 2009 Order (Doc. No. 18). Thus, this case is now pending on the defendants' motion for summary judgment. Upon consideration of this motion, the evidentiary materials filed in support thereof and the plaintiff's response to the motion, the court concludes that the defendants' motion for summary judgment is due to be granted.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[2] The party moving for summary judgment "always bears the initial responsibility of

---

[2] Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions." Fed. R. Civ. P. 56 Advisory Committee Notes. Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word – genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination." *Id*. "'Shall' is also restored to express the direction to grant summary judgment." *Id*. Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing the prior versions of the rule remain equally applicable to the current rule.

informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [ – now dispute – ] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may . . . grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it.") A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

In civil actions filed by inmates, federal courts

> must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted). Consequently, to survive the defendants' properly supported motion for summary judgment, Jones is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claim for relief. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Fed. R. Civ. P. 56(e). "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249-50. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions . . . , in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995)

4

(grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment . . . ."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary

judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine dispute of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-24 (Summary judgment is appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine dispute as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525; *Brown v. Crawford*, 906 F.2d 667, 670

(11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, Jones fails to demonstrate a requisite genuine dispute of material fact in order to preclude summary judgment. *Matsushita*, *supra*.

### III.  DISCUSSION

#### A.  Absolute Immunity

With respect to any claim lodged against the defendants in their official capacities, they are immune from monetary damages. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997). In light of the foregoing, it is clear to the court that the defendants are state officials entitled to sovereign

immunity under the Eleventh Amendment for any claim seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

### B. Disposition of Deliberate Indifference Claim

In September of 2008, Jones arrived at Elmore and the "defendants . . . prescribed medication and [sustenance] for plaintiff because plaintiff cannot [swallow] solid food; but will not order the treatment necessary to [determine and] eliminate the [exact] problem." Pl.'s Compl. (Doc. No. 1) at 3. Jones alleges the defendants failed to provide adequate medical treatment for his chronic constipation which caused him to "suffer with serious stomach pain" and experience significant weight loss. *Id*. The defendants deny they acted with deliberate indifference to Jones' medical condition and, instead, maintain they provided Jones with appropriate treatment for his condition.

To prevail on a constitutional claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that those responsible for providing the treatment acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986).

Specifically, medical personnel may not subject inmates to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *Mandel v. Doe*, 888 F.2d 783, 787 (11th Cir. 1989). When seeking relief based on deliberate indifference of responsible officials, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not 'every claim

> by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.' *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291; *Mandel,* 888 F.2d at 787. Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' *Rogers,* 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 ('Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'); *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). Moreover, "whether government actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995); *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact that prison inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer,* 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991). . . . Even assuming the existence of a serious risk of harm and causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists–and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2001). Thus, for Jones to survive summary judgment on his deliberate indifference claim against the defendants, he is "required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995).

The medical records filed herein demonstrate that during Jones' confinement at Elmore correctional medical personnel, in accordance with their professional judgment and as dictated by their assessment of his condition, consistently provided treatment to Jones for his constipation and resulting bowel discomfort. Def.'s Ex. A (Aff. of Donald McArthur - Doc. No. 16-1) at 1-11; Def.'s Ex. B (Aff. of Paul Corbier, M.D.- Doc. No. 16-2) at 2-6; Def.'s Ex. A (Medical Records of Frank Jones - Doc. No. 16-1) at 13-204. The probative evidentiary materials before the court further demonstrate that the prison medical staff routinely examined Jones, thoroughly evaluated his complaints, carried out requisite tests, performed x-rays, referred him to a free-world physician specializing in

gastroenterology for additional evaluation and treatment, provided medical profiles allowing contravention of normal correctional procedures, and prescribed various medications for both pain relief and in an effort to alleviate his constipation. The prescribed medications included Prilosec, Zantac, Reglan, Milk of Magnesia, Lactulose, Colace, Mylanta, Simethicone, Phenergan, Dulcolax, Fleets Enema, Magcitrate, Ultram, Percogesic, Tylenol and hemorrhoid cream. Medical personnel followed all orders regarding Jones' treatment in accordance with the instructions issued by the attending physician, physician's assistant and the free-world physician.

Defendant McArthur sets forth the following summary of medical treatment provided to Jones regarding the claim presented in the instant complaint:

> During my employment at Staton, I did participate in the provision of medical services to Mr. Jones . . . . Because of the close proximity of Staton and Elmore Correctional Facility ("Elmore"), the medical staff at Staton is often involved in and/or responsible for the provision of medical services to those inmates at Elmore. Mr. Jones first arrived at Elmore Correctional Facility on September 8, 2008 . . . .
> * * *
> Prior to his arrival at Elmore . . . , Mr. Jones had experienced chronic constipation and bowel discomfort over a significant period of time. In fact, as of the time of his arrival at Elmore, Mr. Jones had been heavily dependent upon laxatives for some period of time in order to achieve any bowel movement. In February of 2006, Mr. Jones underwent an EGD study [or esophago gastroduodenoscopy which entails the use of a fiber optic scope to view the esophagus and stomach] during his incarceration at Bibb Correctional Facility, which was . . . inconclusive and only resulted in a recommendation [from the free world physician] that Mr. Jones continue taking Prilosec (a proton pump inhibitor) and consider further study if the symptoms persisted. In the month prior to his transfer to Elmore, x-rays of

Mr. Jones's abdomen and chest did not reveal any specific condition leading to his complaints of chronic constipation.

Upon his arrival at Elmore, Mr. Jones began receiving medications, medical treatment and evaluations on a regular basis for his complaints of chronic constipation. From the time of his arrival at Elmore in September of 2008 through April of 2009 [the period of time relevant to this case], Mr. Jones was seen by me and/or Dr. Corbier on a least twenty-five (25) different occasions, averaging roughly three examinations per month.

Mr. Jones did not submit any sick call request forms requesting . . . medical treatment between September and December of 2008, but he did submit a total of 13 sick call request forms between January 1, 2009, and May 14, 2009. Though some of the sick call request forms submitted by Mr. Jones during this period of time did relate to other non-urgent medical conditions, a majority of the sick call request forms did relate to his complaints of chronic constipation [and associated pain]. As indicated in his medical records, on each occasion that Mr. Jones requested any medical attention during this period of time, he was promptly seen by members of the medical staff at Staton. In addition to the occasions when Mr. Jones requested non-urgent medical attention through the sick call process, he also was brought to the health care unit for immediate evaluation on nine (9) different occasions between January and May of 2009. As indicated in [the plaintiff's medical records submitted herewith], on each occasion that Mr. Jones made complaints which were deemed urgent in nature or warranting immediate evaluation by the medical staff, he was immediately brought to the attention of the medical staff and was evaluated promptly by a member of the medical staff.

Throughout his incarceration at Elmore, Mr. Jones has received orders from me and other members of the medical staff (including Dr. Corbier) to receive a dietary supplement, Ensure. We regularly attempted to re-evaluate and adjust Mr. Jones's medication regime to find the combination of medications best suited to address his complaints. I, along with Dr. Corbier, attempted to control Mr. Jones's chronic constipation through numerous different medications including: Prilosec (proton pump inhibitor), Zantac, Reglan, Milk of Magnesia, laxatives (Lactulose), stool softeners (Colace), anti-gas medications (Mylanta and Simethicone), anti-nausea medication (Phenergan), suppositories (Dulcolax), bowel preparations to clear his bowel (Fleets enema and Magcitrate), pain medications (Ultram, Percogesic, Tylenol) and hemorrhoid cream.

Because of the various medications prescribed for him, it has been and is important for Mr. Jones to take his medication, as prescribed. Mr. Jones has demonstrated difficulty in complying with the pill call process whereby he is provided his medication by members of the medical staff. As indicated through his medical records, Mr. Jones failed to appear for pill call at approximately 6:00 a.m. [the early morning pill call] on at least sixteen (16) different occasions in the beginning of March 2009 to receive his Lactulose (laxative medication). More recently, Mr. Jones has been permitted to keep possession of his own medication without going through the pill call process. While this process does make the medication more accessible to Mr. Jones, it also eliminates [the medical staff's] ability to monitor his day-to-day medication administration and requires him to notify us in the event that his medication unexpectedly needs refilling or if he has lost or otherwise been unable to take his medication. Therefore, in the event that Mr. Jones has not recently received any of this medications, it is due to his failure to notify the medical staff that he has either run out of medication, or for whatever reason, misplaced or lost his medication so that it cannot be taken.

In addition to the medication prescribed for him, [the medical staff] has also conducted other testing and ordered additional consultations regarding his complaints of chronic constipation. The medical staff has conducted extensive laboratory testing, i.e. blood work and urinalyses in order to attempt to derive some understanding as to the cause of Mr. Jones's continued complaints of constipation and abdominal discomfort without any clear cut answers. When necessary, Mr. Jones has been housed in the infirmary or "Medical Observation Unit" at Staton so that he could receive fluids intravenously. Mr. Jones underwent a barium enema which also did not reveal any cause for his symptoms. In October of 2008, Mr. Jones developed an anal fissure (likely secondary to his chronic constipation), which was eventually resolved through various medications.

[The medical staff] regularly entered orders permitting Mr. Jones to deviate from the protocols and requirements imposed upon the inmate population by the ADOC policies and procedures, allowing him to remain in his bunk for extended periods of time over the course of [the time allowed by the pertinent profile].

Ultimately, we elected to refer Mr. Jones to a gastroenterologist in . . . February of 2009, for further evaluation of his complaints. Following a February, 2009, appointment with a gastroenterologist, the medical staff scheduled Mr. Jones for two procedures recommended by the

14

gastroenterologist: a colonoscopy and an esophago gastroduodenoscopy, also known as an "EGD". Mr. Jones [subsequently] underwent a colonoscopy on March 26, 2009, which did not result in any findings of any significance other than a hemorrhoid and one colon polyp that was not likely the cause of his continued complaints of constipation. At that time, he also underwent the EGD in which the specialist determined that Mr. Jones likely suffered from an inflammation of his digestive tract, but did not find any specific reasons for Mr. Jones's chronic constipation. As part of Mr. Jones's March, 2009, consultation with the gastroenterologist, the medical staff at Staton received the [free-world] specialist's opinion and recommendations that Mr. Jones continue taking medication for gastritis (i.e inflammation of the stomach lining) and be scheduled for a follow-up colonoscopy in March of 2010.

In addition to treatment for his chronic constipation, Mr. Jones has also received regular treatment for hypertension, which included management of his condition with prescription medication and frequent monitoring of his condition through chronic care clinics held by the medical staff on a regular basis.

As of the date of this affidavit, I along with Dr. Corbier have made substantial efforts in order to identify the origin or cause of Mr. Jones's complaints of chronic constipation. We have conducted numerous and extensive diagnostic testing including invasive procedures such as a colonoscopy and an EGD, as well as imaging studies. None of these extensive tests or the additional blood work or urinalyses conducted by the medical staff, have resulted in any findings of any kind which would enable us (or the independent gastroenterologist) to identify any specific disease and/or medical condition causing Mr. Jones's chronic constipation which could be specifically addressed either through surgical intervention or medication. Though [correctional medical personnel] have referred Mr. Jones to a gastroenterologist for another opinion, this consultation including the studies directly ordered by the gastroenterologist have not resulted in any additional findings or recommendations with regard to this particular patient. At this time, the gastroenterologist has recommended that the medical staff continue the current treatment regimen of medication designed to alleviate Mr. Jones's symptoms. In short, we simply cannot identify any cure for Mr. Jones's chronic constipation and there does not appear to be any medication regimen which would completely alleviate or eliminate his symptoms.

I have not at any time ignored any request by Mr. Jones for medical

15

> treatment. I have not deliberately ignored any medical complaints made by Mr. Jones or interfered in any way with the provision of medical care to Mr. Jones at any time. I have not [knowingly] taken any action which has caused Mr. Jones to experience any unnecessary pain and/or suffering. Much to the contrary, I have made every effort to ensure that [correctional medical personnel] have proactively sought out every reasonable course of medical treatment and evaluation to identify the cause of Mr. Jones's complaints and alleviate or at a minimum reduce the symptoms that he has experienced. Indeed, if I knew of a course of medical treatment that would eliminate Mr. Jones's chronic constipation, I would have recommended such a course of action.

Def.'s Ex. A (Aff. of Donald McArthur - Doc. No. 16-1) at 3, 7-11 (citations to medical records omitted).

During his tenure as the medical director at Staton, Dr. Corbier managed the medical treatment provided to Jones from September of 2008 until March of 2009 when Corbier accepted a position in Nashville, Tennessee. The affidavit filed by Dr. Corbier addresses the claim before this court, in pertinent part, as follows:

> As indicated in Mr. Jones's medical records [filed herein] . . . , Mr. Jones's medical history demonstrated that he had experienced chronic constipation for a period of time preceding his arrival at Elmore. At the time of his arrival at Elmore, Mr. Jones had pending prescriptions for various medications intended to control or reduce the symptoms associated with his chronic bowel problems. As with any new inmate arriving at Elmore, I reviewed his medical records and prior medical treatment in conjunction with my first examination of him. I specifically recall that Mr. Jones's historical medical treatment revealed a notable reliance upon laxatives, bowel preparations and other medications intended to improve his bowel functions, which had provided varying degrees of relief of his symptoms – the most significant of which was constipation. Though the medical staff at Fountain Correctional Facility (where Mr. Jones was previously incarcerated) did make efforts to identify a cause of Mr. Jones's bowel condition such as an

esophago gastroduodenoscopy or "EGD," lab work and other imaging studies, none of these tests had provided any information leading to a definitive diagnosis.

When Mr. Jones arrived at Elmore, I along with Mr. Donald McArthur, a physician's assistant working under my supervision and direction, made a concerted effort to identify the cause of Mr. Jones's chronic constipation while attempting to control and limit his symptoms through the use of various medication regimens. Though we initially continued Mr. Jones's existing prescriptions ordered by his prior physician, we later elected to alter his medications when it became evident to us that the previously prescribed medications were not entirely effective in addressing Mr. Jones's complaints.

When Mr. Jones's symptoms worsened during late 2008 and [the beginning of] 2009, we continued to adjust his medication regimen to provide him with relief. There was at least one occasion in the latter part of November of 2008 when Mr. Jones[] complained of severe constipation and discomfort and we elected to house Mr. Jones in the facility's infirmary or "Medical Observation Unit" in order to receive intravenous fluids. When Mr. Jones's symptoms subsided, he was eventually released back to the general population at Elmore. Throughout the first roughly three (3) months of Mr. Jones's incarceration, we attempted to treat his chronic constipation with medication. During this period of time, Mr. Jones received prescriptions for various medications intended to address his complaints, including a proton pump inhibitor, Zantac, Reglan, Milk of Magnesia, laxatives, stool softeners, anti-gas medications, anti-nausea medication, suppositories, bowel preparations to clear his bowel and pain medications. Because Mr. Jones failed to regularly attend pill call to receive his medications, we also provided his medications to him via the "Keep-on Person" protocols so that he could self-administer his medication as prescribed. Because of Mr. Jones's condition, we also ordered him to take the dietary supplement, Ensure, in an effort to ensure that he was maintaining proper nutrition during this period of time. As we treated Mr. Jones's symptoms medically, we also continued to monitor Mr. Jones's condition through lab work, including blood testing and urinalyses. We also provided Mr. Jones with physician's orders (sometimes called "Profiles") that allowed him to deviate from the standard operating procedures of the Alabama Department of Corrections, which, for example, allowed him to remain in his bunk for extended periods of time.

In January of 2009, it became evident that Mr. Jones's symptoms were

not improving and that specialty consultations would be necessary to more extensively investigate the cause of his continued complaints. At that time, Mr. McArthur and I agreed to refer Mr. Jones to an outside gastroenterologist for further evaluation. Mr. Jones first saw a gastroenterologist in February of 2009. Following this appointment, the gastroenterologist recommended that Mr. Jones undergo several procedures including another EGD as well as a colonoscopy. The medical staff at Staton scheduled these procedures for Mr. Jones, which occurred at the end of March, 2009. Unfortunately, both the EGD and colonoscopy failed to reveal the cause of Mr. Jones's chronic constipation. Following these procedures, the consulting gastroenterologist recommended that we continue to treat Mr. Jones for bowel inflammation, also known as "gastris," and conduct a follow-up colonoscopy in one year. In other words, the gastroenterologist recommended that we continue to attempt to alleviate Mr. Jones's symptoms through medication.

    I am not aware of any occasion that Mr. Jones voiced complaints regarding his condition [to health care personnel] and was not evaluated in a timely fashion by the medical staff. Mr. Jones never indicated to me that he believed we should be doing anything more than the care that was provided to him. I was not aware that Mr. Jones was dissatisfied or otherwise concerned about the scope of medical services provided to him when he was under my care.

    In my professional medical opinion, Mr. Jones's chronic constipation has been a condition of unknown origin or epidemiology throughout the time he was under my care. Over the course of the last approximately ten (10) months, we followed a well-accepted and clinically appropriate course of treatment for Mr. Jones's complaints of chronic constipation which involved an initial treatment through medications with monitoring through lab and diagnostic testing followed by specialty consultation with a board-certified gastroenterologist which confirmed the propriety of the course of treatment being provided to Mr. Jones. There is no objective medical evidence which provided us with any definitive grounds for a medical diagnosis of Mr. Jones's condition. As confirmed by the consultation with a gastroenterologist, there is no indication of any kind that Mr. Jones would derive any benefit from surgical intervention of any kind. At this point, there is no reason to believe that Mr. Jones's condition is life-threatening, though monitoring of his condition should continue consistent with the monitoring provided in the past.

    I have not at any time ignored any request by Mr. Jones for medical

18

>  treatment. I have not deliberately ignored any medical complaints made by
>  Mr. Jones or interfered in any way with the provision of medical care to Mr.
>  Jones at any time . . . I have made every effort to ensure that [the
>  correctional medical staff] sought out every reasonable course of medical
>  treatment and evaluation to identify the cause of Mr. Jones's complaints and
>  alleviate or at a minimum reduce the symptoms that he has experienced.

Def.'s Ex. B (Aff. of Paul Corbier, M.D. - Doc. No. 16-2) at 3-6. The undisputed medical records support the assertions made by the defendants and contain additional details with respect to the treatment provided to Jones.

Under the circumstances of this case, it is clear that the course of treatment undertaken by the defendants was neither grossly incompetent nor inadequate. Although Jones asserts he should have been provided a different treatment regimen for his chronic constipation and related issues--a regimen he does not identify–this purely conclusory and suppositious assertion clearly fails to establish deliberate indifference. *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to demonstrate a constitutional violation); *Adams*, 61 F.3d at 1545 (whether medical personnel "should have employed additional . . . forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for liability under the Eighth Amendment."); *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment). It is undisputed Jones


received significant medical treatment as dictated by objective evaluations of his condition. Based on well settled law cited herein, his mere desire for a different mode of medical treatment does not amount to deliberate indifference.

Jones fails to present any evidence which indicates the defendants knew the manner in which they treated his medical condition created a substantial risk to his health and that with this knowledge consciously disregarded such risk. The record is devoid of evidence, significantly probative or otherwise, showing the defendants acted with deliberate indifference to Jones' chronic constipation. Consequently, summary judgment is due to be granted in favor of the defendants. *Carter*, 352 F.3d at 1350.

A separate order will accompany this memorandum opinion.

Done this 15th day of December, 2011.

>/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE